**IN THE UNITED STATES DISTRICT COURT IN AND FOR THE
SOUTHERN DISTRICT OF FLORIDA**

**John Gazzola,**

**Plaintiff,**

**v.**

**State of Florida, Alexcia Cox, Greg Kridos, Lauren Brody, Richard Faver, Linda Faver, and Michael Stone,**

**Defendants.**

Case No.: _____

**PLAINTIFF'S COMPLAINT**

Plaintiff, Mr. John Gazzola, sues Defendants and alleges:

**Jurisdiction and Venue**

1. This Court has federal question jurisdiction under 28 U.S.C. §1331 because Plaintiff asserts claims arising under the Fifth Amendment to the United States Constitution. 42 U.S.C. §1983 incorporation.

2. This Court has supplemental jurisdiction over Plaintiff's Florida tort claims under 28 U.S.C. §1367 because they arise from the same case or controversy as the federal claims.

1

3. Venue is proper in the Southern District of Florida under 28 U.S.C. §1391 because the events giving rise to the claims occurred in this District and Defendants reside or conduct business here.

**Verified Facts**

1. John Gazzola was incarcerated at the Palm Beach County West Detention Center in Belle Glade, Florida, from February 2, 2026, through February 14, 2026 for a crime that he did not commit.

2. His release was granted by Circuit Judge Howard Coates on a supervised own recognizance bond because Gazzola had no family or outside support who could afford to pay the $11,000 bond (or $1,000 to a bondsman according to local customs or practices), and Animal Control was set to put his horse, Domenico, who he cares for deeply, up for adoption or euthanization pursuant to Florida Statutes, if he did not pick the horse up by a deadline that was approaching on February 16, 2026. Mr. Gazzola is an Equine Services expert, and he treats his horse with the highest standard of care.

3. Animal Control appeared at the jail during his incarceration and informed him that he had 5-days to pick up his horse, Domenico, or else the horse, an Andalusian stallion, would be put up for adoption or humanely euthanized, shocking him and causing him severe emotional distress while in custody. He was already emotionally susceptible because of his upbringing, which involved child abuse and many deaths in his family in New York.

2

4. They told him Domenico would be adopted out or euthanized within five (5) days if he did not retrieve him. His attorney, the undersigned, in his capacity at the time as an Assistant Public Defender in Palm Beach County, was able to obtain two extensions to the date of February 16, 2026.

5. There had been no allegation of animal abuse, and Domenico was in excellent condition at the time of seizure. As a matter of fact, Mr. Gazzola has a very detailed and specific feeding and grooming regimen for Domenico. His protocols for Domenico's care could not even be met while Animal Control was in possession of said horse. In fact, the horse became atrophied while in Animal Control's custody, became mal-nutritioned, and covered in fungus. Animal Control was embarrassed to give the horse back because it did not have the resources to provide the correct boarding for him. The agency, through its Lieutenant representative, admitted to the undersigned that the horse could not be boarded at their facility Mr. Gazzola has nothing but love for his animals.

6. Mr. Gazzola could not retrieve the horse because he remained in custody on the $11,000 bond. But-for his and the undersigned's efforts, he would have lost possession of Domenico due to the collective actions of the Defendants.

7. On February 2, 2026, Plaintiff Gazzola had been arrested on clearly false allegations of trespass and burglary.

3

8. He was arrested and forcibly removed from the property located at 14127 Equestrian Way, Wellington FL, 33414, "The Property," where he was lawfully boarding Domenico, and where he had all of his personal property, including-but-not-limited to his computer, family heirlooms, personal effects, and items he uses to take care of his animals and operate his business, Blue Ribbon Equine Services. Any reasonable due diligence would show he had permission to be there.

9. The property at 14127 Equestrian Way, "The Property," is a horse farm owned by Carol Fraser and Robert "Bob" Fraser.

10. Fraser leased the property to Defendants Richard Faver and Linda Faver, and Fraser purportedly gave power of attorney over the property to realtor and public figure, Lauren Brody, the leader of the scheme to defame and ruin Plaintiff Gazzola, so that they could "get rid" of him. Ms. Brody recently lost her election for town council representative in Wellington, Florida.

11. Plaintiff Gazzola had been lawfully boarding his horse at 14127 Equestrian Way at the time of his arrest. Despite any allegations of the Defendant State of Florida, Mr. Gazzola had the right to be on the property or, at the very least, a reason to believe he had that right, such that there was no probable cause for the Defendant Palm Beach County Sheriff's Office to arrest him for Burglary or Trespass. Any charge against Mr. Gazzola is or was in reckless disregard of the Florida Statutes.

Florida Statute Section 810.02, states in relevant part: "burglary" means: "entering or remaining in a dwelling, a structure, or a conveyance with the intent to commit an offense therein."

Florida Statute Section 810.08, states in relevant part: "trespass" means: "Whoever, without being authorized, licensed, or invited, willfully enters or remains in any structure or conveyance, or, having been authorized, licensed, or invited, is warned by the owner or lessee of the premises, or by a person authorized by the owner or lessee, to depart and refuses to do so, commits the offense of trespass in a structure or conveyance."

On its face, from the Probable Cause Affidavit in 2026 CF 000825, the criminal case by the Defendant State of Florida against John Gazzola, there was never any evidence of intent to commit a crime inside for Burglary, nor was there ever any evidence of a "willful" trespass, even though those are the charges that law enforcement swore to in their grossly negligent probable cause affidavit..

12. As previously stated, Plaintiff John Gazzola operated a horse-care business called Blue Ribbon Equine Services ("Blue Ribbon").

13. Blue Ribbon provided and provides Federal Equestrian International (FEI), show-grooming, equine property management, and young horse development services.

14. Blue Ribbon had a good reputation with clients and served high profile riders Jessica

5

Mendoza (of Triple M Farm),  Cian O'Connor (Of Coolmore/Karlswood), and Lisa Wilcox (of Lisa Wilcox Dressage , and others, who are Olympic medalists in the equestrian community.

15. The business had an incredibly positive reputation in the exclusive equestrian community with organic growth from the onset before the events described caused by the Defendants and had hundreds of thousands of dollars in revenue.

16. Tensions between Plaintiff Gazzola and the defendants have been escalating within the Wellington equestrian community.

17. The conflict began approximately in 2022 and was exacerbated by an interaction between Gazzola and Linda Faver that occurred back in or around June of 2025 on Brittany Kasprack's farm, 2169 Appaloosa Trail, Wellington, Florida.

18. During that interaction, Defendant Linda Faver was walking her dogs off leash on the horse farm, owned by Brittany Kasprack, where Plaintiff Gazzola lawfully was conducting his business, residing, and minding his own business. Mr. Gazzola told her that walking her dogs off-leash on a horse farm was unsafe. They began speaking because Ms. Faver's dog was unleashed and approaching Mr. Gazzola and his dog during his routine evening walk.

19. He did not exhibit aggression whatsoever during the exchange.

20. Linda Faver misinterpreted the interaction and took it as an affront.

6

21. She relayed her interpretation to her husband, Richard Faver, and told him that Plaintiff Gazzola assaulted her. Mr. Gazzola, before he found out that Mrs. Faver was making this accusation, lived alongside the Favers for six (6) months with no issues. Mr. Faver was somewhat cordial with Mr. Gazzola to hide the fact that he was making these allegations behind Mr. Gazzola's back.

22. Afterward, the Defendants, including an individual named Michael Stone, began spreading negative statements, including-but-not-limited to starting rumors that he assaulted Ms. Faver, abuses illegal substances, has mental issues, and is physically abusive towards animals. The last rumor regarding animal abuse is repulsive to Mr. Gazzola because it could not be further from the truth as shown by Mr. Gazzola's incredibly well cared-for animals.

23. These statements included claims about his mental health, which the Defendants intentionally and severely damaged.

24. They also included false statements about his business practices, including that he is a horse-abuser, a scam artist, and that he does nothing but get evicted and file lawsuits. They continually and falsely accuse him of being a thief and committing domestic violence in the About Grooms for Employers group on Facebook. He has lost hundreds of thousands of dollars of potential revenue due to these defamatory rumors. Mr. Stone has been colluding with Defendants and others including clients of Mr. Gazzola to trespass Mr. Gazzola from nearly every farm in Wellington, as confirmed by a Palm Beach County deputy during Mr. Gazzola's most recent

7

trespass warning at 14845 Collecting Canal in Loxahatchee, allegedly owned by Paul Parisi and James Hayes. This harassment has caused Mr. Gazzola to have to move his horse eight (8) times in six (6) months.

25. Any accusations of assault or battery were never prosecuted because they were untrue.

26. Statements like these circulated on Facebook on the group, "Grooms Needed" (referring to horse grooming) and within equestrian forums, including Chronicle of the Horse, a subscription platform often used and visited throughout the equestrian community.

27. The statements damaged Gazzola's business and irreparably damaged Gazzola's reputation in the community to the point where he was and is being actively blocked by prospective clients and employees.

28. Defendant Lauren Brody was running for Wellington City Council during this period, and is well-acquainted with the aforementioned Defendants and co-conspirators.

29. Defendant Brody posted a YouTube video titled The Napoleon Files *to her personal Youtube page*.

30. In the first fifteen seconds of the video, she stated she was proud to have "got[ten] rid of the worst person that Wellington had ever had the displeasure to deal with" on Monday, February 2, 2026, the date of Plaintiff Gazzola's arrest, demonstrating her personal hatred of Plaintiff and

8

broadcasting it to the world. In this video, Brody goes on to discuss Wellington politics in pursuit of her own self-gain in running for city-council.

31. Gazzola understood this statement to refer to him as did multitudes of people in Wellington and the equestrian community due to the false rumors against his good name. On or around December 4, 2025, while Mr. Gazzola was litigating his civil matter pro se, in part against Lauren Brody, Mr. Gazzola transmitted a preservation of evidence notice to her. Almost immediately after, Defendant Brody posted on "Info About Grooms for Employers" on Facebook, "@everyone If you have ever hired and then fired a groom discussed in this group….if you have ever been threatened by a groom discussed in this group….action is being taken, and your help is needed." Approximately 1,200 farm owners, trainers, and riders had access to that post.

32. Brody played a central role in instigating the criminal prosecution against him. She allegedly had power of attorney over The Property and was standing in Plaintiff Gazzola's doorway when she got the police to arrest him despite her knowledge of his lawful reason for being on The Property, i.e., boarding his horse Domenico and living in the tack room, where saddles and bridles are stowed. This action constituted illegal **eviction by conviction**.

33. Her motive was personal animus and political considerations.

34. The defendants disliked Gazzola because of his successful business and loud personality.

9

35. They find his personality distasteful because they are members of the elite class of equestrian high-society, and they believe John Gazzola does not belong.

36. The Defendants engaged in a coordinated effort to remove him from the community by having him arrested unlawfully.

37. Their actions intentionally harmed his business, personal reputation, and stability.

38. As a result, Gazzola feels like a pariah in Wellington, has suffered severe emotional damages. They are attempting to drive him insane so that he either leaves or commits suicide.

39. He was even trespass warned from a local bagel-shop despite doing nothing wrong, showing how pervasive and ubiquitous the defamatory rumors are that the Defendants Lauren Brody, Richard Faver, and Linda Faver spread about him.

40. At the time of his arrest, Gazzola had been litigating civil case 2025CC13757, which was initiated on August 28, 2025 and was still active at the time.

41. That case involved a property dispute and harassment related to the same defamatory conduct of Defendants Brody and the Favers, which has been ongoing and continues to this day.

42. Defendants Brody and Richard Faver attempted to manipulate Gazzola's pending civil

litigation by having him arrested so that he would miss filing deadlines and mandatory court hearings.

43. The civil case was in fact dismissed with prejudice during his incarceration.

44. By the time he retained counsel, the presiding judge had already decided to dismiss the matter.

45. Judge Mullinax, who presided over that case, ignored the undersigned's notice of appearance on that case, and has dismissed the case with prejudice. It has since been reopened for consideration Mr. Gazzola's motion for relief.

46. The defendants withheld from deputies the fact that Gazzola was lawfully boarding his horse on the property.

47. Deputies did not check court records that would have clearly shown active civil litigation concerning the property, and the arrest would have been avoided. They also ignored Mr. Gazzola's statements to that effect. Defendant Brody bullied the police into arresting him.

48. Deputies did not listen to Gazzola about his lawful presence on the property.

49. Deputies seized his horse, Domenico, despite no evidence of abuse.

11

50. Witness Teresa Matteson removed Gazzola's personal belongings from the property after his arrest.

51. Among the missing items was a framed photograph of his deceased grandfather and his grandmother's death certificate, further contributing to his emotional distress.

52. Gazzola has been unable to locate that photograph.

53. The Defendants' actions deprived him of his freedom, property, and dignity.

54. He has experienced social isolation as a result of the Defendant's conduct.

55. He had no family, friends or former business partners or customers able to assist with bond as a result of the defamatory rumors being spread about him by the Defendants. His reputation has suffered irreparable harm.

56. Defendant Assistant State Attorney Greg Kridos was eventually identified as the prosecutor assigned to the filing decision in the felony criminal matter, Palm Beach County 2026 CF 000825, where the Sheriffs, without any probable cause or evidence, charged him with Burglary and Trespass.

57. On February 8, 2026, the undersigned attorney contacted Assistant State Attorney Elizabeth Neto.

58. Neto stated via email that she had not yet been assigned the case so she could not assist or review the case.

59.  Kridos also stated he had not been assigned the case.

60. The 21-day filing deadline passed without the case *even being assigned* to a filing attorney with the State Attorney's Office, which under the Florida Rules of Criminal Procedure, is the deadline by which the State of Florida must file before a defendant in a criminal case is entitled to an adversarial hearing to determine probable cause.

61. The undersigned attorney filed a motion for an adversarial probable cause hearing.

62. The motion asserts that there had been no probable cause for the arrest.

63. The failure to assign the case is systemic failure of the criminal justice system in Florida. The Office of the State Attorney routinely fails to file before the 21-day deadline for many cases that it ultimately decides not to file because of gross negligence, failure to assign a case, and having a separate department where at least ASA Neto and ASA Kridos work from home, and on information and belief, at least ASA Kridos works from home in North Carolina.

64. The regular delays constitute a policy of systemic violations of due process, and this violation harmed John Gazzola financially and emotionally beyond repair.

65. During this period, the elected State Attorney for the 15th Judicial Circuit of Florida viewed Gazzola's Facebook page and postings from her *personal* Facebook account. Plaintiff alleges that she has a personal connection to this case, which may stem from her political connections to Defendant Lauren Brody or an individual named Yussef Belmas, who is a former employer of Mr. Gazzola and has threatened him with prosecution through the State Attorney's Office.

66. Deputies visited witness Theresa Matteson to pressure her regarding statements about Gazzola while the criminal case was pending, and she even received a text message from Defendant Lauren Brody improperly stating that she was not allowed to contact Gazzola or be of assistance to him when she was his only lifeline.

67. The Defendant were and are attempting to isolate him socially and emotionally.

68. Their actions were and are intended to cause him severe emotional distress.

69. The Defendants want him removed from the community and are acting maliciously.

70. The Defendants' actions are coordinated and conspiratorial.

71. The Defendants' actions are intended to damage his business.

72. The Defendants' actions are intended to damage his reputation.

14

73. The actions of the Defendants Lauren Brody, Richard Faver, and Linda Faver were and are intended to influence the criminal process with respect to 26CF000825 in Palm Beach County.

75. The defendants' actions were intended to influence the civil process with respect to 25CC013757 and other pending matters.

76. The Defendants' actions were designed to cause, and did cause, Plaintiff John Gazzola's longterm and irreparable harm, both to his person and business prospects.

## CAUSES OF ACTION

### Against All Defendants

### COUNT I: Violation of Due Process Under the Due Process Clause of the 5th Amendment of the Constitution of the United States

1. Defendants deprived Plaintiff of protected liberty and property interests without due process.

2. Defendants caused Plaintiff to be arrested, charged, or prosecuted without probable cause and based on false, misleading, or fabricated information. With respect to the State of Florida, this violation was a result of the systemic problem inherent in having a separate filing division with attorneys who works remotely. This problem affects thousands of defendants in criminal actions in Palm Beach County, Florida.

3. Defendants' actions resulted in unlawful imprisonment, reputational harm, financial loss, and other damages.

### COUNT II: Malicious Prosecution (Not Ripe Until Bona Fide Termination)

1. Defendants initiated and continued criminal proceedings against Plaintiff.

2. The criminal case and the filing of charges were initiated without probable cause.

3. Defendants acted with malice.

4. The criminal case must terminate in Plaintiff's favor.

5. Plaintiff suffered damages including emotional distress, reputational harm, and economic losses.

## COUNT III: Abuse of Process

1. Defendants used legal process against Plaintiff for an ulterior or improper purpose.

2. The process was used in a manner not intended or authorized by law, including to harass, intimidate, retaliate, or gain leverage over Plaintiff.

3. Plaintiff suffered damages as a direct result of Defendants' misuse of legal process.

## COUNT IV: Intentional Infliction of Emotional Distress

1. Defendants engaged in extreme and outrageous conduct beyond all bounds of decency.

2. Conduct included fabricating allegations, pursuing baseless criminal charges, and publicly accusing Plaintiff of crimes.

3. Defendants intended to cause emotional harm or acted with reckless disregard for the likelihood of causing such harm.

4. Plaintiff suffered severe emotional distress and related damages.

### Against Defendants Lauren Brody, Richard Faver, Linda Faver, and Michael Stone

## COUNT V: Defamation Per Se

1. Defendants made false statements of fact accusing Plaintiff of criminal conduct, bad business practices, and intentionally impugned his character.

2. Such statements constitute defamation per se because they are so inherently harmful that damages should be presumed.

3. Statements were published to third parties without privilege.

4. Damages are presumed, and Plaintiff also suffered actual harm including emotional distress and reputational injury.

## COUNT VI: Libel

16

1. Defendants published written false statements about Plaintiff.

2. The statements were made intentionally, maliciously, or with reckless disregard for the truth.

3. The publications harmed Plaintiff's reputation, standing in the community, and business relationships.

4. Plaintiff suffered damages including emotional distress and economic loss.

**COUNT VII: Tortious Interference with Business Relationships**

1. Plaintiff had existing and prospective business relationships or economic expectancies.

2. Defendants knew of these relationships.

3. Defendants intentionally and unjustifiably interfered by making false accusations, initiating baseless criminal charges, and spreading defamatory statements.

4. Defendants' interference caused the loss of clients, opportunities, income, and business goodwill.

5. Plaintiff suffered economic and reputational damages.

**COUNT VIII: Conversion of Personal Property**

1. Plaintiff owned or had the right to immediate possession of certain personal property.

2. Defendants wrongfully took, retained, or interfered with Plaintiff's property, including items seized or withheld during the baseless criminal process.

3. Defendants' actions were unauthorized and inconsistent with Plaintiff's ownership rights.

4. Plaintiff suffered financial loss and other damages.

**COUNT IX: Organized Scheme to Defraud**

1. Defendants engaged in a systematic, ongoing course of conduct designed to defraud Plaintiff.

2. Defendants made false statements, fabricated allegations, misused legal process, or engaged in deceptive acts to obtain money, property, or other benefits.

3. Defendants acted intentionally and with fraudulent purpose.

4. Plaintiff suffered financial losses and other damages as a result of the scheme.

**Prayer For Relief**

**WHEREFORE**, Plaintiff John Gazzola respectfully demands a jury trial. He requests declaratory judgment against the Defendants, injunctive relief, compensatory damages, punitive damages, attorneys' feeds and all other relief that he may be entitled to under the law.

## Verification

I certify that my attorney has reviewed all of the facts and legal conclusions in this document with me. All of the factual allegations, and admissions, and denials asserted above are true and correct under penalty of perjury.

State of Florida
County of Palm Beach

Sworn and subscribed before me this __10__ day of
__March__, 20_26_ by_John Gazzola_, who
produced _Florida Drivers Lice_
as identification.

_____
John Gazzola, Plaintiff

VALERIE SOLOMON
MY COMMISSION # HH 432564
EXPIRES: December 10, 2027

## CERTIFICATE OF SERVICE

I certify that a copy hereof has been served in accordance with the Federal Rules of Civil Procedure to all Defendants as of this _____ day of _____, 2026.

Respectfully submitted,

By:_____
  Alexander J. Liebmann, Esq.
  Florida Bar No. 1032726
  700 S Rosemary Street #204-101
  West Palm Beach, FL 33401
  Tel. (845) 270-3843
  alexander@liebmannmckeen.com